**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal Action No. 2016-0026** |
| ) | |
| **ALVIN HENRY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
**Kia D. Sears, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant Alvin Henry*

**MEMORANDUM OPINION**

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Alvin Henry's ("Defendant") "Motion to Suppress," filed on May 1, 2017, and the Government's "Opposition to Defendant's Motion to Suppress," filed on May 12, 2017. (Dkt. No. 63; Dkt. No. 66). An evidentiary hearing was held in this matter on December 14, 2017. For the reasons discussed below, the Court will deny Defendant's Motion to Suppress.

# I.   FACTUAL BACKGROUND[1]

On November 30, 2016, the Government filed an Information against Defendant and his Co-Defendant Lamech Mathew ("Matthew") charging them each with two counts. (Dkt. No. 20).[2] Count 1 is conspiracy to possess a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B)(iii)-(C), and 846. Count 2 is possession of cocaine powder with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.

At the suppression hearing held on December 14, 2017, U.S. Customs and Border Protection ("CBP") Officer Richard Anderson, CBP Officer Renael Steele, and Homeland Security Investigations ("HSI") Special Agent Nathaniel Copping testified for the Government. Defendant did not call any witnesses. The following facts emerged from the record established at the hearing.

At approximately 3 p.m. on November 2, 2016, Officer Anderson was performing Customs enforcement duties with Officer Steele and additional CBP officers in the boarding area of the Henry E. Rohlsen Airport on St. Croix.[3] Among the additional CBP officers present was K-9 Officer Patrick King, who was leading his K-9—which Officer Anderson testified is trained to detect narcotics and hidden human beings—through the boarding area. Officer Anderson's duties

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] Prior to filing the Information, the Government commenced this action by filing a Criminal Complaint on November 3, 2016. (Dkt. No. 1).

[3] During the suppression hearing, witnesses referred to the area in the airport where passengers wait to board flights after passing through a prescreening checkpoint as both the "boarding area" and the "waiting lounge." For purposes of this Opinion, the Court will employ the term "boarding area."

included observing the reactions of passengers in the boarding area to Officer King and his K-9 for signs of nervousness, suggesting their possible possession of contraband.

Officer Anderson testified that as Officer King and his K-9 approached Defendant, who was seated in the boarding area, Defendant stood up and pulled his bags off of the floor and towards his chest.[4] Officer Anderson found this suspicious, as it appeared to him that Defendant wanted to hide something in his bags from the K-9. Officer King then told Defendant to put his bags back down on the ground, and Defendant complied. The K-9 sniffed Defendant's bags, but did not alert.

Officers Anderson and Steele decided to search Defendant's bags. Officer Steele testified that he walked up to Defendant, who was talking on a cellphone, and asked Defendant if he could check his bags. According to Officer Steele, Defendant looked directly at him and replied: "Yes."[5] Officer Steele opened the first of Defendant's two bags and observed a brick-shaped package wrapped in duct tape. He then opened Defendant's second bag and observed more brick-shaped packages wrapped in tape. Officer Steele did not remove the packages from Defendant's bags at that point. Officer Anderson could not see inside Defendant's bags, but Officer Steele informed him that there were "bricks" in the luggage. Officer Anderson noted that among CBP officers, "bricks" means packages containing narcotics. Officer Anderson testified that he did not ask Defendant any questions about the bags while in the boarding area, but assumed that the bags were

---

[4] Officer Steele also testified that he personally observed Defendant pick up his bags and pull them toward his shoulders. Officer Steele acknowledged, however, that the report on the incident he created approximately 30 minutes to one hour later made no mention of this action by Defendant.

[5] Officer Anderson did not provide any testimony regarding Defendant's consent to the search of his bags. Officer Anderson noted, however, that when he conducts random searches of luggage in the boarding area, he conducts the searches regardless of whether the owner of the luggage consents to the search. Officer Anderson further testified that he randomly searched the luggage of another individual who was in close proximity to Defendant, even though that individual did not do anything to raise Officer Anderson's suspicion.

Defendant's because they were in his possession. Officer Anderson placed Defendant in handcuffs, and Officers Anderson and Steele escorted Defendant, along with his bags, to the secondary inspection area in the airport.[6]

Upon arriving in the secondary inspection area, Officers Anderson and Steele were joined by CBP Officer Gisselle Lopez. Officer Lopez asked Defendant three questions: "Is this your bag? Did you pack the bag yourself? Are you aware of everything that is in the bag?" Defendant was not advised of his *Miranda* rights before Officer Lopez questioned him. Defendant responded that the bags were his, but that he did not know if anyone else had placed anything in the bags.[7] CBP officers then searched Defendant's bags and removed brick-shaped objects wrapped in duct tape from both bags. CBP officers performed a field test on the contents of the duct-taped packages. The contents of the packages tested positive for cocaine. Officer Steele testified that there was no further dialogue between the CBP officers and Defendant following the questioning by Officer Lopez.

After the contents of the packages field-tested positive for cocaine, CBP officers alerted Special Agent Copping and other HSI agents that Defendant was in their custody in the secondary inspection area.[8] Special Agent Copping responded to the secondary inspection area, where Defendant was seated in a chair against the wall with his hands cuffed behind his back. The bags and duct-taped packages were on the table. Special Agent Copping spoke with CBP officers about

---

[6] As described by Special Agent Copping, the secondary inspection area is a windowless room the size of a small office containing chairs and a metal table. The secondary inspection area is purposely sealed off from the general public.

[7] Both Officer Anderson and Officer Steele referred to Defendant's responses to these questions as an "oral binding declaration" and testified that CBP officers routinely ask the same three questions of individuals taken to the secondary inspection area.

[8] Several HSI agents were participating in a training session at the airport at the time.

why and how Defendant was detained. Other than asking Defendant whether he needed to go to the bathroom or wanted water, Special Agent Copping did not question Defendant while in the secondary inspection area, nor did he hear any other HSI agent or CBP officer question Defendant. Different CBP officers and HSI agents entered the secondary inspection area while Special Agent Copping was there. He estimated that, at any given time, between two and four law enforcement personnel were in the secondary inspection area.

After speaking with the CBP officers, Special Agent Copping, along with HSI Special Agent James Brian O'Quinn, escorted Defendant to the HSI sub-office within the airport. The sub-office is a small room, large enough for two desks and chairs. Upon arriving in the sub-office, the HSI agents seated Defendant in a chair. The HSI agents also sat down in chairs approximately four feet away from Defendant on either side. Defendant remained in handcuffs, but the HSI agents transferred the handcuffs from behind Defendant's back to in front of his body. Because the HSI agents intended to interview Defendant but did not have a video camera to record the interview, the HSI agents did not begin their questioning right away.[9] After a few minutes, while still waiting for the camera to arrive, the HSI agents decided to advise Defendant of his *Miranda* rights.[10] The HSI agents read Defendant his *Miranda* rights, asked Defendant if he wished to speak with them, and provided Defendant with a *Miranda* waiver form, which they told him to read and sign if he wished to speak with them. Defendant told the HSI agents that he wished to speak with them and signed the *Miranda* waiver form. The Government introduced the *Miranda* waiver form—bearing

---

[9] Special Agent Copping testified that another HSI employee was contacted to bring a video camera from HSI's main office in the Sunny Isle shopping center.

[10] Special Agent Copping testified that the HSI agents decided to Mirandize Defendant before the camera arrived because they were sitting around "not doing anything productive" and "figured that one thing [Defendant] could do off-camera would be to sign the *Miranda* form since there is independent evidence of it."

the signatures of Defendant, Special Agent Copping, and Special Agent O'Quinn—into evidence at the suppression hearing.

The HSI agents did not begin questioning Defendant after he signed the *Miranda* form because the camera had not arrived. A few minutes later, there was a power outage at the airport and an alarm went off. The HSI agents decided to evacuate the building with Defendant. The HSI agents escorted Defendant outside the airport where they stood for a short period of time before deciding to relocate to the HSI main office at the Sunny Isle shopping center to interview Defendant.[11] Special Agent Copping testified that, to the best of his recollection, Special Agent O'Quinn transported Defendant to the HSI main office in an HSI vehicle. Special Agent Copping traveled to the HSI main office in a separate vehicle. The HSI agents travelled in different vehicles because they had arrived at the airport that morning separately for a training session. There was no testimony about what conversation, if any, occurred between Special Agent O'Quinn and Defendant as they traveled to the HSI main office. Special Agents O'Quinn and Copping arrived at the HSI main office simultaneously.

Upon arriving at the HSI main office, Defendant was placed in a holding cell as the HSI agents prepared the lunch room in the main office for an interview with Defendant. The lunch room is a small room containing one table with seating space for four people. The HSI agents set up a hand-held video camera to record the interview. Two subsequent interviews of Defendant conducted by the HSI agents were recorded in their entireties.[12]

---

[11] Initially, the HSI agents and Defendant stood in front of the airport after evacuating. Because he was still handcuffed, Defendant expressed to the HSI agents that he was concerned about reputational damage if people saw him in handcuffs; therefore, the HSI agents moved Defendant to another area out of public sight.

[12] The Government introduced the recordings of both interviews into evidence at the suppression hearing.

The HSI agents began their first interview of Defendant at the HSI main office approximately one hour after Defendant signed the *Miranda* waiver at the HSI airport sub-office. Before questioning Defendant at the HSI main office, the HSI agents again asked Defendant whether he understood his *Miranda* rights and whether he wanted to speak with them. Special Agent Copping testified that Defendant stated clearly that he wished to speak with the HSI agents. The HSI agents then proceeded to interview Defendant.

Following the initial interview with Defendant, HSI agents also interviewed Co-Defendant Matthew. In light of the information provided by Matthew, Special Agents Copping and O'Quinn decided to interview Defendant again approximately two or three hours after the initial interview. The HSI agents did not re-Mirandize Defendant before the second interview. During the interviews, Defendant admitted to the HSI agents that he was aware that cocaine had been placed in his luggage and stated that he had planned to board the airplane with the cocaine. (Dkt. No. 16 at 2).[13] Following the interviews, the HSI agents requested to search Defendant's two cellphones. Defendant consented to the cellphone searches and signed consent-to-search forms for both phones.[14]

## II. DISCUSSION

### A. Search of Defendant's Luggage

Defendant asserts that Officers Anderson and Steele seized him "without the requisite reasonable suspicion" in violation of his Fourth Amendment rights when they detained him at the

---

[13] Although there was no testimony about the substance of the interviews at the suppression hearing, the Government introduced video recordings of the interviews into evidence.

[14] The Government introduced the consent forms into evidence at the suppression hearing.

airport and subjected his bags to search. (Dkt. No. 63 at 3). He argues that "there were no facts present at the time of [his] seizure which would indicate to the officers that they were justified in searching or detaining him." *Id.* Defendant requests that all tangible evidence, including the cocaine in the duct-taped packages, be suppressed as it would not have been discovered but for the CBP officers' illegal search of Defendant. *Id.* at 3-4.

The Government responds that—even assuming that the CBP officers did not have reasonable suspicion to seize Defendant—no Fourth Amendment violation occurred because the CBP officers were permitted to search Defendant's luggage absent reasonable suspicion pursuant to the border search exception. (Dkt. No. 66 at 2-3).

### 1. Applicable Legal Standards

The Fourth Amendment prohibits government agents from conducting unreasonable searches and seizures. *United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994) (citing *Harris v. United States*, 331 U.S. 145, 150 (1947)). Whether a search is reasonable "depends upon all of the circumstances surrounding the search and seizure and the nature of the search and seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Although a warrantless search is generally considered presumptively unreasonable, the courts recognize exceptions to the warrant requirement in "certain limited situations." *Hyde*, 37 F.3d at 118 (citing *Horton v. California*, 496 U.S. 128, 133 (1990); *Montoya*, 473 U.S. at 537). "Border searches are one such exception." *Id.*

The government's "authority to conduct routine searches and seizures at the border, without probable cause or a warrant," for the purpose of levying duties and intercepting contraband is well-recognized. *Montoya*, 473 U.S. at 537 (citing *United States v. Ramsey*, 431 U.S. 606, 616-617 (1977)). Searches at the border designed to "'protect [the United States] by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the

fact that they occur at the border . . . .'" *Hyde*, 37 F.3d at 119 (quoting *Ramsey*, 431 U.S. at 616).

Travelers entering the United States also have more "'limited justifiable expectations of privacy' . . . ." *Id.* (quoting *Ramsey*, 431 U.S. at 623 n.17). "[N]ot only is the expectation of privacy less at the border than in the interior . . . [but] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya*, 473 U.S. at 539-40.

Two conditions must be met for the border exception to apply. First, the search must occur at the "physical boundaries of the nation" or its "functional equivalent." *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir. 1985) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973)). The Third Circuit has examined the issue of whether the Henry E. Rohlsen airport on St. Croix is the "functional equivalent" of a national border for purposes of a Fourth Amendment analysis with respect to persons and items leaving St. Croix and entering the mainland. In *Hyde*, the Third Circuit thoroughly reviewed the history of Customs searches at the border between the Virgin Islands and the continental United States. *Hyde*, 37 F.3d at 120-23. Finding the Government's interest "in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders," the *Hyde* Court held "that routine customs searches of persons and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment." *Id.* at 117, 122. As such, the Henry E. Rohlsen airport is the "functional equivalent" of an international border for purposes of the Fourth Amendment analysis.

Second, the search must be *routine* for the border exception to apply. *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008). Moreover, if routine, a border search "may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any

suspicion of wrongdoing." *Id.* (citing *Montoya*, 473 U.S. at 538; *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir.1985)). "[C]ertain searches, classified as 'nonroutine,' require reasonable suspicion of wrongdoing to pass constitutional muster." *Id.* (citing *Montoya*, 473 U.S. at 541). To distinguish between routine and non-routine searches, "[c]ourts have focused on the privacy interest and the intrusiveness and indignity of the search." *Id.* (citing *United States v. Cardenas*, 9 F.3d 1139, 1148 n.3 (5th Cir.1993); *United States v. Vega–Barvo*, 729 F.2d 1341, 1344–46 (11th Cir.1984)). The Third Circuit recognizes "patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search" as routine searches. *Id.* at 485-86 (citations omitted). Non-routine searches include "body cavity searches, strip searches, and x-ray examinations [of the body] . . . by virtue of their significant intrusion on an individual's privacy." *Id.* at 486 (citations omitted).

### 2. Analysis

As noted above, the Third Circuit held in *United States v. Hyde*, 37 F.3d 116, that the Henry E. Rohlsen airport is the "functional equivalent" of an international border, and as such the border exception applies with respect to searches that occur at the airport. *Id.* at 117. During the suppression hearing, however, Defendant attempted to distinguish *Hyde* by arguing that *Hyde* dealt with the search of an individual as part of a prescreening process, whereas in the instant case Defendant's luggage was searched in the boarding area *after* passing through the prescreening checkpoint.[15] Although Defendant ultimately conceded that there is no reasonable suspicion

---

[15] Defendant also argued that the border exception as described in *Hyde* eliminates the probable cause and warrant requirements, but does not eliminate the requirement that a search at the border be justified by reasonable suspicion. This argument is easily dismissed because the elimination of a reasonable suspicion requirement for a border search is well-established by other binding precedent. *See, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine [border] searches of the persons and effects of entrants are not subject to any requirement of

requirement to perform a routine search of passengers at a prescreening checkpoint, he argued that reasonable suspicion is required to search an individual who has already passed the prescreening checkpoint without incident and is seated in the boarding area. The justification for drawing such a distinction, Defendant argued, is that a search occurring after a traveler has passed through the prescreening checkpoint is more intrusive in nature than a search at a prescreening checkpoint to which all travelers are subject, and therefore should be supported by individualized suspicion.

Defendant presented no authority for the novel proposition that the border exception ceases to apply once an individual and his luggage have passed through a prescreening checkpoint without incident, and the Court is aware of none. Given the rationale underlying the border exception— that searches of persons and items at the border are presumptively reasonable because of the government's interest in preventing the movement of contraband across the border—the Court sees no legitimate justification for limiting the application of the border exception once an individual has passed through a prescreening checkpoint and is waiting to board a flight. Such a limitation would seem at odds with the exception's underlying rationale.

In this regard, the Court finds the case of *United States v. Ezeiruaku*, 936 F.2d 136 (3d Cir. 1991), to be instructive. In *Ezeiruaku*, U.S. Customs inspectors at the Philadelphia International Airport conducted an operation to intercept unreported currency leaving the United States in passenger luggage. *Id.* at 137. The inspectors selected four passengers on a Lufthansa flight, one

---

reasonable suspicion, probable cause, or warrant . . . ."); *United States v. Scheer*, 600 F.2d 5, 7 (3d Cir. 1979) ("[W]e join the Fifth and Seventh Circuits in upholding the constitutionality of a search conducted at the border, or equivalent entry point . . . notwithstanding the absence of probable cause or even a quantum of individualized suspicion, but merely because the item was entering the United States from abroad."); *United States v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir. 1991) ("An incoming routine search at the border needs no articulable suspicion to justify it . . . .").

of whom was Ezeiruaku, for further review based on the destinations of their connecting flights out of Frankfurt, Germany. *Id.*[16] After determining that Ezeiruaku had paid for his luggage in cash and observing that his female companion had "shown an 'abnormal interest in the Customs [inspectors] in the area,'" the inspectors decided to search Ezeiruaku's checked luggage. *Id.* at 138. The checked luggage of passengers on the flight was at that point "being placed in containers to be loaded on the plane . . . [and] Ezeiruaku's bags [were] outside the building, ready to be loaded on the plane." *Id.* The search of Ezeiruaku's luggage revealed $265,000 in unreported cash, and he was arrested. *Id.*

The district court—finding that the border exception was inapplicable to the search of Ezeiruaku's luggage and that the search was not supported by reasonable suspicion—granted Ezeiruaku's subsequent motion to suppress. *United States v. Ezeiruaku*, 754 F. Supp. 420, 431 (E.D. Pa. 1990), *rev'd*, 936 F.2d 136 (3d Cir. 1991). The district court also concluded that the search of Ezeiruaku's luggage was "non-routine" because "[t]he search was initiated by an inchoate hunch, [and was] conducted partially in secret without notice and consent for the sole purpose of obtaining evidence of criminal conduct." *Id.* In reversing the district court, the Third Circuit noted that "[t]he district court concluded that the requirements of reasonable suspicion, probable cause or a warrant apply to searches of personal luggage [at the border] notwithstanding . . . case law interpreting the constitution that specifically deals with this issue." *Ezeiruaku*, 936 F.2d at 142. The Third Circuit further disagreed with the district court's conclusion that the search of the luggage was "non-routine," which, according to the Third Circuit, "fl[ew] in the face of the clear teachings of this court . . . ." *Id.* at 141.

---

[16] There was evidence in the record that Frankfurt had "air connections to many high-risk areas for currency exportation," including Nigeria, the destination of Ezeiruaku's connecting flight.

Defendant's argument that the border exception ceases to apply after an individual and his luggage pass through a prescreening checkpoint and are in the boarding area cannot be reconciled with the Third Circuit's holding in *Ezeiruaku*. If the border exception applies to the search of luggage even after it has been transported outside of an airport terminal to be loaded onto a plane—as was the case in *Ezeiruaku*—the border exception must also apply to the search of individuals and luggage in an airport boarding area, regardless of whether the luggage was previously searched at a prescreening checkpoint. Accordingly, the Court rejects Defendant's argument that the border exception should not apply in this case based on the location of the search. A contrary result would "fl[y] in the face of the clear teachings of [the Third Circuit] . . . ." *Id.* at 141.

Further, based on the uncontested facts in the record, the Court finds that the search of Defendant by Officers Anderson and Steele was routine. Officer Steele testified that he opened Defendant's bags in the boarding area of the airport and observed brick-shaped packages wrapped in duct tape. Both Officer Steele and Officer Anderson testified based on their experience conducting Customs investigations that packages wrapped in such a manner are consistent with narcotics trafficking. Officer Steele did not remove any items from Defendant's bags while in the boarding area. Officer Anderson placed Defendant in handcuffs only after Officer Steele observed the packages in Defendant's bags.

In light of the Third Circuit's recognition that a routine border search includes a luggage search by Customs officials, the Court concludes that the search in this case was routine. *See Whitted*, 541 F.3d at 485–86 ("[P]atdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously . . . invasive search, are routine . . . ."). Defendant's suggestion that a search after one reaches the boarding area is somehow more intrusive simply because all travelers may not be subject to such a search fails to

recognize that the kind of intrusion courts have deemed sufficient to render a search non-routine, and thus of a nature to require reasonable suspicion, is of a far greater magnitude. Nothing in the record indicates that Officers Anderson and Steele took any action that was so highly intrusive as to convert the routine border search into a non-routine search. *See id.* at 486 (identifying limited instances in which a search becomes "nonroutine by virtue of [its] significant intrusion on an individual's privacy).[17]

Because the Court finds that Officers Anderson and Steele performed a routine border search in this case, no reasonable suspicion was required to justify the search. In view of the fact that Defendant's Fourth Amendment rights were not implicated by the routine border search, the Court will deny Defendant's request to suppress all tangible evidence discovered as a result of the search.

## B. *Miranda*

Defendant seeks the suppression of all statements he made to CBP officers and HSI agents based on his contention that (1) Officer Lopez subjected him to a custodial interrogation without providing *Miranda* warnings, and (2) statements Defendant later made to HSI agents after waiving

---

[17] As the First Circuit has explained, courts have highlighted a number of factors for consideration in evaluating whether a search was so invasive as to be considered "non-routine." *United States v. Braks*, 842 F.2d 509, 511-12 (1st Cir. 1988). These factors include "(i) whether the search results in the exposure of intimate body parts or requires the suspect to disrobe; (ii) whether physical contact between Customs officials and the suspect occurs during the search; (iii) whether force is used to effect the search; (iv) whether the type of search exposes the suspect to pain or danger; (v) the overall manner in which the search is conducted; and (vi) whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search." *Id.* at 512. "[T]he only types of border search of an individual's person that have been consistently held to be non-routine are strip-searches and body-cavity searches." *Id.* at 512-13. In light of these factors, the Court finds that the nature and circumstances of the search in this case render inescapable the conclusion that Officers Anderson and Steele performed a routine border search.

his *Miranda* rights were the involuntary product of coercion by law enforcement. (Dkt. No. 63 at 6-7). Specifically, Defendant argued at the suppression hearing that his statements during the interrogations by HSI agents—which were preceded by *Miranda* warnings—are inadmissible because the administration of *Miranda* warnings by the HSI agents failed to cure the alleged *Miranda* violation by Officer Lopez when she questioned Defendant in the secondary inspection area at the airport. The Government responds that (1) no *Miranda* warnings are required when CBP officers question individuals during a secondary inspection at the border, and (2) Defendant validly waived his *Miranda* rights and provided voluntary statements to the HSI agents during the later interrogations. (Dkt. No. 66 at 4-6).

## 1.    Applicable Legal Standards

*Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted)). Additionally, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012));

*see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (noting that the *Miranda* doctrine need only be enforced "in those types of situations in which the concerns that powered the decisions are implicated" and inquiring whether the stop at issue "exert[ed] upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer*, 468 U.S. at 442). Further, an "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### a. Application of *Miranda* in the Border Context

In *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), the Third Circuit examined at length the application of *Miranda* rules in the context of immigration inspections at international borders, holding that "normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id.* at 529. (citing *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999); *see also United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) ("[N]ormal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States.") (citing *Kiam*, 432 F.3d at 529–30). Immigration and Customs officers have a responsibility to inspect entrants at our borders, and "[s]uspicion of criminal conduct cannot overrule [that] simultaneous responsibility . . . ." *Kiam*, 432 F.3d at 531 (citing *United States v. Silva*, 715 F.2d 43, 48 (2d Cir.1983) (holding that Customs officers were "duty-bound to determine whether Silva was entitled to enter the country with her effects" regardless of their suspicion of

criminal conduct, and *Miranda* warnings were not required)). Further, an individual seeking to enter the United States "does *not* have a right to remain silent." *Id.* at 529 (citing *Gupta*, 183 F.3d at 617). As such, individuals seeking to enter the United States may be questioned without *Miranda* warnings even if subject to custody and may be "taken out of a primary inspection line for secondary questioning . . . ." *Id.* at 529-30 (citing *Gupta*, 183 F.3d at 617-18). While *Kiam* specifically addressed immigration screening at international borders, a Third Circuit panel later relied on *Kiam* to apply its holding to the Customs inspection context. *St. Vallier*, 404 F. App'x at 656 n.4. ("[W]e find no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.") (citing *Kiam*, 432 F.3d at 531; *Silva*, 715 F.2d at 48).

The Third Circuit recognizes that even in the border context, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). Where an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . this line has been crossed." *Id.* The line is not crossed, however, where there is "mere overlap" between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution. *Kiam*, 432 F.3d at 530 n.6; *see also St. Vallier*, 404 F. App'x at 657 (noting "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity" and holding that "questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*"). While "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only

practically relate to a potential criminal prosecution," the fundamental inquiry is whether a customs official's questions "bear upon both admissibility and criminal conduct, while not relating solely to the prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657-58 (citing *Kiam*, 432 F.3d at 530 n.6).

### b. Waiver of *Miranda* Rights

An individual may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. To determine whether an individual's waiver of *Miranda* rights was valid, courts must ask (1) whether it was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception," and (2) whether it was "made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir.1989) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

"Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F.Supp.2d 738, 741 (D.V.I.1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986). "A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Swint*, 15 F.3d 286, 289 (3d Cir.1994)). "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary." *Id.* (citing *Schneckloth*, 412 U.S. at 225-26). "A necessary predicate to a finding of involuntariness is

coercive police activity," and "there must be some causal connection between the police conduct and the confession." *Id.* (citing *Connelly*, 479 U.S. at 167).

### 2. Analysis

Defendant argues that his *Miranda* rights were violated when Officer Lopez questioned him in the secondary inspection without first providing *Miranda* warnings. (Dkt. No. 63 at 4-5). The Government does not dispute that Defendant was "in custody" for purposes of the *Miranda* analysis when he was handcuffed and taken to secondary inspection by the CBP officers. Rather, the Government cites *Kiam* for the proposition that Officer Lopez was not required to provide *Miranda* warnings where she "only questioned the defendant about his bags and did not ask him any questions about the cocaine found in his bags." (Dkt. No. 66 at 5-6).

### a. Defendant's Statements to CBP Officers

The evidence in the record establishes that Officer Lopez asked Defendant three questions after he was escorted in handcuffs to the secondary inspection area. At that point, Officer Steele had already discovered the brick-shaped packages in Defendant's bags. Officer Steele suspected that the packages contained narcotics, although a field test of the contents of the packages—which would confirm whether the packages contained cocaine—had not yet been performed. Defendant was not advised of his *Miranda* rights before Officer Lopez questioned him.

Officer Lopez asked Defendant: "Is this your bag? Did you pack the bag yourself? Are you aware of everything that is in the bag?" Defendant responded that the bags were his, but that he did not know if anyone else had placed anything in the bags. Officers Anderson and Steele referred to Defendant's response to the three questions as an "oral binding declaration," and testified that CBP officers routinely ask these three questions of individuals that are taken to the secondary inspection area for further investigation. After Officer Lopez questioned Defendant, CBP officers

performed a search of his bags and removed brick-shaped objects wrapped in duct tape from both bags. The CBP officers then performed a field test on the contents of the duct-taped packages. The contents of the packages tested positive for cocaine. Officer Steele testified that there was no further dialogue between the CBP officers and Defendant following the questioning by Officer Lopez.

The Court agrees with the parties that *Kiam* and *St. Vallier* are instructive here. Officer Lopez's questions occurred in the unique border context where "normal *Miranda* rules simply cannot apply . . . ." *Kiam*, 432 F.3d at 529. The determinative question thus becomes whether Officer Lopez "crossed the line" established by the Third Circuit in *Kiam* when she questioned Defendant about his ownership of the bags and awareness of their contents without providing *Miranda* warnings. If Officer Lopez's questions "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the questions crossed the line, and *Miranda* warnings were required. *Id.* at 530; *see also United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015) (finding that *Miranda* warnings were required where CBP officers asked a defendant questions about his involvement with drug activity that "had nothing to do with whether or not to admit [the defendant] into the country."). But if there was simply an overlap between questions relevant to the admissibility of Defendant's bags into the United States and questions relevant to possible criminal conduct, the questions did not cross the line, and no *Miranda* warnings were required. *Kiam*, 432 F.3d at 530 n.6; St. *Vallier*, 404 F. App'x at 657.

During the suppression hearing, Defendant argued that because the CBP officers suspected that Defendant was in possession of narcotics even before Officer Lopez's questioning, her questions no longer related to the issue of the admissibility of Defendant's bags into the United

States, but rather were part of the CBP officers' criminal investigation into Defendant. Defendant pointed to the *St. Vallier* court's recognition that "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution." *St. Vallier*, 404 F. App'x at 658 (citing *Kiam*, 432 F.3d at 530 n.6). The Court also notes that, in a case involving similar facts, this Court determined that a Customs official's questions did not cross the *Kiam* line where that questioning occurred *before* the discovery of drugs. *See United States v. Barrett*, 2011 WL 4443432, at *8 (D.V.I. Sept. 22, 2011) (finding that "all the questions asked by [a Customs inspector] up until the point where he discovered drugs on Barrett's person were permissible in that [his] questions were a means of determining whether Barrett or his effects were admissible and did not relate solely to criminal prosecution for drug offenses").

The evidence in the record establishes that the CBP officers suspected Defendant's involvement in narcotics trafficking as of the moment that Officer Steele discovered the brick-shaped packages in Defendant's bags in the boarding area. Officer Steele informed Officer Anderson during the search that there were "bricks" in the bags. Officer Anderson testified that, among CBP officers, "bricks" means packages containing narcotics. Officer Anderson then handcuffed Defendant and escorted him to the secondary inspection area. Although the CBP officers did not formally determine that the packages contained cocaine until the field test was completed, the evidence indicates that the CBP officers were aware at the time that Officer Lopez questioned Defendant that Defendant might be subject to a criminal prosecution, based on their discovery of the brick-shaped packages.

But the fact that the CBP officers suspected that Defendant was involved in criminal activity before Officer Lopez questioned him is not dispositive with respect to the issue of whether

*Miranda* warnings were required. The Third Circuit has made clear that a "mere overlap" between questions relating to admissibility of persons or effects and questions relating to criminal activity does not trigger the need for *Miranda* warnings. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657. Indeed, the Third Circuit has specifically *refused* to "hold that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the [individual] before questioning him on any subject." *Kiam*, 432 F.3d at 530. As explained in *St. Vallier*:

> [D]eterminations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity. A criminal offense, such as illegal reentry, may be inextricably tied to a person's admissibility, yet customs officers are not required to provide Miranda warnings prior to asking questions that might bear upon this illegal conduct. The same is true when an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border. Accordingly, suspicion of criminal conduct does not overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders. Similarly, questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*.

*Id.* at 657 (citations and internal quotations omitted). Further, the test outlined in *Kiam* and *St. Vallier* calls for an *objective* inquiry into whether the Customs officials' questions ceased to have a bearing on their Customs duties, rather than an inquiry into the subjective intent of the officers in questioning an individual. *See United States v. Harder*, 180 F. Supp. 3d 355, 365 (E.D. Pa. 2016) (finding that regardless of Customs agents' "subjective intent, their questions certainly had a bearing on Defendant's admissibility and did not '*only* further a potential criminal prosecution'") (citing *Kiam*, 432 F.3d at 530).

Officer Lopez's three questions to Defendant addressed two themes: (1) whether the bags belonged to Defendant, and (2) whether Defendant was aware of the contents of the bags. Defendant argued that these questions were superfluous with respect to the issue of admissibility,

and could only be relevant to the potential criminal prosecution of Defendant, given that Defendant was clearly in possession of the bags. The Government argued that questions about Defendant's ownership of the bags and his knowledge of their contents are a recognized part of a basic Customs inquiry directly relevant to the question of admissibility. Had Defendant disclaimed ownership of the bags by claiming, for example, that he had been watching them for a friend or fellow traveler, such a response would bear on whether Defendant himself should be permitted to board his flight, and likely would have resulted in further inquiry by the CBP officers to determine the same.

Given the objective nature of the inquiry as established in *Kiam* and *St. Vallier*, the Court finds that Officer Lopez's questions were relevant both to Defendant's "admissibility and [to] criminal conduct, while not relating solely to prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657. Undoubtedly, Officer Lopez's questions elicited inculpatory responses that aided law enforcement in its criminal prosecution of Defendant. But basic questions about an individual's ownership of luggage and awareness of its contents are fundamental to CBP officers' responsibilities in determining the admissibility of persons and effects into the United States. Although *Kiam* cautioned that once an individual "admits to a[] []customs inspector that he is smuggling drugs into the country, it might be improper for the inspector to proceed to question the [individual], without *Miranda,* regarding the weight, purchase, and plans for, the drugs he is smuggling," Officer Lopez's questions were limited to an inquiry into whether Defendant was the owner of the bags and was aware of their contents. *Kiam*, 432 F.3d at 530 n.6. Indeed, after Officer Lopez asked the three basic questions of Defendant and the field test confirmed that the packages in Defendant's bags contained cocaine, the CBP officers ceased all questioning of Defendant and requested the assistance of HSI agents. This is precisely the established procedure that the Third Circuit discussed approvingly in *Kiam*. *Id.* at 530 n.5.

In short, because the routine questions were objectively relevant to Officer Lopez's investigation into Defendant's admissibility, Officer Lopez was not required to provide Defendant with *Miranda* warnings before questioning him. Defendant's arguments to the contrary are rejected and his statements to the CBP officers will not be suppressed.

### b.    Defendant's Waiver of *Miranda* Rights

At the suppression hearing, Defendant conceded that HSI Special Agents Copping and O'Quinn did not employ coercive tactics during their interviews of Defendant, so as to render his statements to them involuntary. Moreover, there is no evidence in the record that Defendant's statements to the HSI agents during those interviews were the involuntary product of coercion or intimidation by law enforcement.[18]

However, based on his contention that Officer Lopez violated his *Miranda* rights when she questioned him in the secondary inspection area, Defendant seeks the suppression of his later

---

[18] In an attempt to cast doubt on the voluntary nature of Defendant's waiver of his *Miranda* rights, Defendant argued at the suppression hearing that the failure of the HSI agents to videotape their administration of *Miranda* warnings to Defendant and the signing of the *Miranda* waiver form by Defendant was suspicious. Defendant also argued that there is no evidence in the record regarding what conversation, if any, occurred between Special Agent O'Quinn and Defendant as Special Agent O'Quinn transported Defendant from the airport to the HSI main office. However, if Defendant believed that anything improper had occurred that bore on the issue of voluntariness, he had the opportunity at the suppression hearing to present witnesses—including officers or the Defendant himself—to offer evidence suggesting impropriety. While the Government certainly bears the burden of establishing voluntariness by a preponderance of the evidence, Defendant cannot successfully challenge the Government's uncontested evidence of voluntariness simply by offering counsel's suspicions without supporting evidence.

Here, there is no evidence in the record to contradict or otherwise give the Court pause as to the testimony of Special Agent Copping that he read Defendant his *Miranda* rights, that Defendant confirmed to Special Agent Copping that he understood his rights, and that Defendant confirmed to Special Agent Copping that he wished to waive his rights and speak to the HSI agents. The Court credits Special Agent Copping's testimony, which is further corroborated by the *Miranda* waiver form bearing Defendant's signature that was introduced into evidence by the Government.

statements to the HSI agents because the "totality of the circumstances surrounding [his] initial interrogation [] rendered his subsequent statements [to the HSI agents] involuntary." (Dkt. No. 63 at 7). In other words, Defendant argues that the alleged *Miranda* violation by Officer Lopez tainted the later interviews by the HSI agents such that Defendant's statements to the HSI agents were involuntary and should be suppressed.

The Court has already determined that Officer Lopez did not violate Defendant's *Miranda* rights when she questioned him in the secondary inspection area. Because no initial *Miranda* violation occurred, the premise of Defendant's argument with respect to his statements to the HSI agents fails, and the suppression of the statements is therefore not warranted on that basis.[19] The evidence in the record establishes that Defendant validly waived his *Miranda* rights before speaking with the HSI agents, and that he provided statements to them voluntarily. His statements

---

[19] Even assuming—although the Court does not so find—that Officer Lopez had violated Defendant's *Miranda* rights through her questioning, Defendant's request to suppress his later statements to the HSI agents would still be denied. The admissibility of Defendant's statements to the HSI agents would be governed by the analysis established by the Supreme Court in *Oregon v. Elstad*, 470 U.S. 298 (1985). *Elstad* governs in situations where law enforcement agents inadvertently fail to administer *Miranda* warnings prior to initial questioning, and later administer the warnings before obtaining a second statement from a defendant. *United States v. Naranjo*, 223 F. App'x 167, 168 (3d Cir. 2007). Where *Elstad* controls, "[t]he relevant inquiry is whether, in fact, [a defendant's] second statement was also voluntarily made" in light of the established totality-of-the-circumstances approach to the determination of voluntariness. *Elstad*, 470 U.S. at 218. Defendant's Motion to Suppress references *Missouri v. Seibert*, 542 U.S. 600 (2004), in arguing that the HSI agents failed to effectively cure the taint of the initial questioning by Officer Lopez. But *Seibert*'s requirement that law enforcement take "specific, curative steps" to cure an earlier *Miranda* violation is applicable only where officers employ a "two-step interrogation technique" to deliberately side-step *Miranda* by intentionally obtaining a pre-*Miranda* confession and later administering *Miranda* warnings and obtaining a second confession. *Seibert*, 542 U.S. at 621-22 (Kennedy, J. concurring). There is no evidence in the record indicating that Officer Lopez questioned Defendant in the secondary inspection area in a deliberate attempt to undermine the dictates of *Miranda*. Instead, the evidence was that CBP officers routinely ask the same three questions of individuals in the secondary inspection area with the understanding that the questions form a standard part of their Customs duties. As such, even had Officer Lopez's questioning constituted a *Miranda* violation, *Elstad*—not *Seibert*— would be applicable here, and Defendant's later voluntary statements to the HSI agents would be admissible.

are therefore admissible. Accordingly, the Court will deny Defendant's request that his statements to the HSI agents be suppressed.

### III. CONCLUSION

For the reasons stated above, the Court will deny Defendant's Motion to Suppress, both as to the tangible evidence discovered as the result of the search of Defendant's bags and the statements made by Defendant to the CBP officers and the HSI agents.

An appropriate Order accompanies this Memorandum Opinion.

Date: January 23, 2018

_____/s/_____
WILMA A. LEWIS
Chief Judge