# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal Action No. 2016-0026 |
| | ) | |
| ALVIN HENRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
 *For the United States*

**Kia D. Sears, Esq.,**
St. Croix, U.S.V.I.
 *For Defendant Alvin Henry*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Alvin Henry's ("Defendant" or "Henry") "Motion to Dismiss Indictment for Prosecutorial Misconduct" ("Motion") (Dkt. No. 190); the Government's "Opposition to the Motion to Dismiss Indictment for Prosecutorial Misconduct" ("Opposition") (Dkt. No. 202); and Defendant's Reply in support of his Motion ("Reply") (Dkt. No. 208). For the reasons set forth below, the Court will deny Defendant's Motion.

### I. BACKGROUND

On December 13, 2018, a grand jury returned an indictment charging Defendant with one count of conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846, and one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II). (Dkt. No. 111).

The charges stem from a Customs and Border Patrol inspection of Defendant's carryon luggage on November 2, 2016, as he waited at the Henry E. Rohlsen Airport on St. Croix, Virgin Islands to board a flight to Miami, Florida. This search resulted in the discovery of five or more kilograms of cocaine.

The jury trial commenced on February 25, 2019. On February 26, 2019, the Government called Defendant's alleged co-conspirator, Lamech Matthew ("Matthew"), as a witness. Matthew had entered a plea agreement with the Government on January 22, 2019. (Dkt. No. 137).

During direct examination, Matthew testified to his role in the conspiracy to traffic cocaine through the Henry E. Rohlsen Airport. He described his employment at the airport and how it led to his initial involvement in the conspiracy at the behest of a family friend. Trial Tr. vol. 2, 126–32. He detailed the method by which he would transport the cocaine to and through the airport. *Id.* at 132–46. Matthew specifically recounted the pertinent events of the instant case, including meeting Defendant on November 1, 2016 and delivering cocaine to Defendant on November 2. *Id.* at 146–58. As part of this testimony, the Government played the surveillance footage of the airport on November 2. *Id.* at 153–58. Matthew also described the events subsequent to his arrest. *Id.* at 159–62. He stated that he was interviewed multiple times and that he lied during his first interview. *Id.* at 160. He described his plea agreement and his agreement to testify against Defendant. *Id.* at 161–62. He stated that under the terms of his agreement, he did not "have to call any names." *Id.* at 162. During his testimony, he did not identify any of his alleged co-conspirators by name except Henry. *See, e.g., id.* at 147.

During the course of Matthew's testimony, it became apparent that Matthew had entered into two agreements with the Government in addition to his plea agreement. The first—the Supplemental Agreement—was a written cooperation agreement which set forth the terms of

Matthew's cooperation that would lead the Government to advocate for a four-point reduction at his sentencing hearing. (Dkt. No. 144 at ¶4.b). The Supplemental Agreement stated, *inter alia*, that "if the government determines that [Matthew] has not provided full and truthful cooperation … or has otherwise violated any other provision of this supplemental agreement and the Plea Agreement, the agreements may be voided." (Dkt. No. 144 at ¶1.j). The second agreement—the Oral Agreement—allowed Matthew to refrain from identifying his alleged co-conspirators, with the exception of Henry, and any "locations [that] would give away the identity of those individuals." Trial Tr. vol. 3, 129–30. Accordingly, Matthew refused to answer defense counsel's questions regarding the identity of other alleged co-conspirators except Defendant:

> [Defense counsel:] When we left off yesterday, I had asked you for the name of the individual who provided you a BMW, right?
> [Matthew:] Correct.
> Q And your response was you don't have to answer that question, right?
> A Correct.
> Q And the reason you gave for why you don't have to answer that question is because your lawyer told you you don't have to answer that question, right?
> A Correct.
> Q And the reason your lawyer told you you don't have to answer that question is because you have an agreement with the government that you don't have to name the names of anyone that's involved in the drug transactions you were involved in other than Mr. Henry, right?
> A Correct.
> Q You have an agreement with the government where you don't have to identify any photographs of anyone connected to your involvement in the drug conspiracy, correct?
> A Correct.
> Q You have an agreement with the government where you don't have to identify anyone on any videos, correct?
> A Other than Mr. Henry, correct.
> Q Excuse me?
> A Other than Mr. Henry, correct.
> Q So you have an agreement with the government that you don't have to identify anyone in the departure lounge video other than Mr. Henry, right?
> A Correct.
> Q And your agreement is that in testifying to your involvement in the conspiracy, the only person you have to identify is Mr. Henry, right?
> A Correct.

3

> Q The BMW, you were given that by somebody involved in your drug conspiracy, right?
> A Correct.

Trial Tr. vol. 4, 10–11.

After hearing from the parties on possible courses of action to address Matthew's refusal to testify fully, Trial Tr. vol. 3, 136–72, the Court "order[ed] the parties to sit down and figure out whether they . . . can come to an agreement," *id.* at 175. The Court further stated, "if you can't, obviously, the Court will resolve it . . . ." *Id.*[1]

The parties subsequently agreed to the manner in which the matter would be handled. *See* Trial. Tr. vol. 6, 5–6. Specifically, (1) Matthew's second recorded interview—in which he identified certain alleged co-conspirators—would be submitted to the jury "for the truth of the matter;" (2) the Government would "be precluded from arguing against them, or rebutting" Matthew's statements in the interview; and (3) the jury would be instructed regarding "the extreme measures the government went through in this case in working out a deal." Trial Tr. vol. 3, 166. In the latter regard, the Government and defense counsel agreed to the following stipulation that the Court read to the jury:

> Lamech Matthew entered into a plea agreement with the government. The plea agreement is contained in Defense Exhibit 24. That agreement was properly filed on the public court docket. The plea agreement between the government and Lamech Matthew included a supplement contained in Defense Exhibit 27. That was not filed on the public court docket, but was properly filed under seal. The government had an obligation to disclose the supplement to the plea agreement to the defense. The government did not inform the defense of the supplement prior to the start of trial. And because the supplement was under seal, the defense did not have access to it. The defense did not learn of the supplement to the plea agreement until after Mr. Matthew testified on direct examination. The government did not

---

[1] This was preceded by the Court's statement: "And so what I suggest is that counsel get together and figure out how they suggest the Court proceed[,] without in any regard Attorney Sears waiving your right to file a motion to dismiss the indictment as you suggested on the basis of prosecutorial misconduct, but for purposes of proceeding with this matter[.] [I]f you all agree how this is to be resolved, the Court will consider that." Trial Tr. vol. 3, 174.

4

> notify the defense of this supplement until defense counsel initiated a discussion with the Court and the government about the scope of the cross-examination.
>
> In addition to the supplement to the plea agreement, the government also entered into an improper oral agreement with Lamech Matthew that is addressed in the Court's jury instruction regarding Defense Exhibit 12. Through their oral agreement, the government and Mr. Matthew agreed that Mr. Matthew was never required to provide any information that would reveal the identity of anyone other than Mr. Henry in connection with his cooperation with the government.
>
> The Court and the defense first learned of this oral agreement during the cross-examination of Mr. Matthew. The individuals covered by the oral agreement between the government and Lamech Matthew are individuals that have larger roles in the conspiracy that Mr. Matthew pled guilty to than the role the government alleges of Mr. Henry. The reason Mr. Matthew gave for not agreeing to testify regarding those individuals was that he was concerned about his family's personal safety.
>
> By reaching the oral agreement with Mr. Matthew, the government agreed that Mr. Matthew did not have to comply with the terms of the supplement to the plea agreement contained in Defense Exhibit 27. The government's tunnel vision in prosecuting Mr. Henry led it to agree that Mr. Matthew did not have to comply with all the terms of the supplement to the plea agreement in order for the government to recommend to the Court at his sentencing that Mr. Matthew receive[] a four-level downward departure from the sentencing guidelines. The agreement to allow Mr. Matthew to receive the benefit of full compliance with the supplement to the plea agreement without having to comply with all its terms is unusual.
>
> The entire ma[nn]er in which the government has handled the testimony of Mr. Matthew is inconsistent with the regular course of business.

Trial Tr. vol. 6, 8–10.

The jury was also instructed that Matthew's second recorded statement to police could be used for its truth, rather than simply as prior inconsistent testimony for impeachment purposes. In his second recorded interview, Matthew admitted that he had lied in his prior interview and detailed his involvement in the conspiracy to traffic cocaine. *See generally* Def. Ex.12. He also stated that he had only met Defendant on the evening of November 1, 2016. *Id.* at 22:20–23:10, 27:20–27:40, 28:14–28:55. As to these statements, the jury was instructed:

> As you were instructed during trial, you may treat Mr. Matthew's statements in Defense Exhibit 12 in the same manner as you will treat the other evidence in this

5

> case. In other words, you may use Mr. Matthew's statements in Defense Exhibit 12 as proof of the truth of what Mr. Matthew said in those statements.

Trial Tr. vol. 6, 45.

During closing arguments, defense counsel argued that Matthew's testimony was unreliable as evidenced by his responses to her cross-examination, his admission that he lied during his first recorded interview, and his agreements with the Government. *See* Trial Tr. vol. 6, 68–70, 74–78, 83–94. Referencing Matthew's inconsistent statements and his admission that he lied in his first recorded interview, defense counsel argued to the jury that Matthew was "not to be trusted when he says how these packages [of cocaine] were placed into Mr. Henry's luggage." *Id.* at 75. The reason Matthew was allegedly not telling the truth, according to defense counsel, was because "he knows that in order to get as little time as possible, he has to testify with what the government believes to be true." *Id.* at 77. To elaborate on this argument, defense counsel set forth the parameters of the plea agreement, Supplemental Agreement, and Oral Agreement. *Id.* at 86–92. Defense counsel further argued that these agreements were evidence that the Government's "tunnel vision" in pursuing Henry led it to "ignore[] all of the evidence suggesting they're wrong" in concluding that Henry committed this crime. *Id.* at 86. Defense counsel continued:

> That's how focused the government was in getting Lamech Matthew to come in here and point the finger and say Mr. Henry, well, actually, didn't even say it, but to create some story that would allow one to try to conclude that Mr. Henry put these bags in his own luggage. Lamech Matthew got a deal that was not in writing, that was hidden from the defense, that was hidden from the Court, and it was all because of the government's tunnel vision in focusing on trying to prosecute Mr. Henry, and ignoring all the evidence out there that suggested that what Mr. Henry told those agents was true.

*Id.* at 92.

Following deliberation, the jury returned a verdict of guilty on both the conspiracy and the possession of cocaine with intent to distribute counts. (Dkt. No. 180). Defendant then filed the instant Motion, arguing that the Indictment should be dismissed because the Government failed to

6

comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) by suppressing the Supplemental Agreement and Oral Agreement, which were favorable to Defendant and bore on Matthew's credibility. (Dkt. No. 190 at 3–5). Defendant further argues that he was prejudiced by the Government's suppression because if "the Court were aware of Matthew's [O]ral [A]greement, the government likely would not have been permitted to call Mr. Matthew as a witness because there was no legitimate reason for Matthew to be excused from answering questions about co-conspirators." *Id.* at 6. Specifically, Defendant alleges that without Matthew's testimony "there would be no witness to impeach [Defendant's] final statement that he neither knew the night before, nor while in the bathroom the day of, that cocaine was going to be placed in his luggage." *Id.* Defendant contends that his case relied on impeaching Matthew's credibility; that the suppression of the Supplemental and Oral Agreements was material to the outcome of the trial; and that prejudice resulted from the suppression. *Id*. at 5–6. Defendant further maintains that the stipulation could not cure the prejudice against him created by the *Brady* violation and thus the Indictment should be dismissed. *Id.* at 7.

In addition to his argument that the Government's failure to disclose the Supplemental and Oral Agreements constitutes a *Brady* violation, Defendant contends that the violation was intentional and "amounted to the commission of a fraud upon the Court." *Id.* at 8–9. Thus, Defendant asserts, dismissal of the Indictment rather than some other remedy is appropriate in order to deter future prosecutorial misconduct. *Id.* at 19. Defendant points to several alleged omissions and misrepresentations by Assistant United States Attorney Daniel Huston ("AUSA Huston"), both in dealings with defense counsel and the Court. *Id.* at 8–16. In addition to the suppression of the Supplemental Agreement and the Oral Agreement, Defendant asserts that AUSA Huston misrepresented that he had followed the Court's Order to turn over all

7

correspondence regarding Matthew's plea agreement. *Id*. at 9–12. Defendant also alleges that AUSA Huston made multiple knowing misrepresentations about the Oral Agreement and Matthew's knowledge of alleged co-conspirators. *Id.* at 12–16. Defendant argues that this constitutes prosecutorial misconduct and a departure from the ethical prosecutorial responsibility to such a degree that the Court should exercise its supervisory powers to dismiss the Indictment. *Id.* at 16–20.

In its Opposition, the Government asserts, *inter alia*, that there was no *Brady* violation or prosecutorial misconduct because Defendant was not prejudiced; therefore, dismissal of the Indictment is not an appropriate remedy. (Dkt. No. 202 at 3, 10). The Government acknowledges that the Supplemental and Oral Agreements are *Brady* material, and that defense counsel did not understand the full scope of the Supplemental and Oral Agreements until Matthew's testimony. *Id.* at 3. However, the Government contends that it fulfilled its obligations under *Brady* in an email to defense counsel (Dkt. No. 202, Ex. 1),[2] and when it elicited the exculpatory evidence about the Supplemental and Oral Agreements during its direct examination of Matthew (Dkt. No. 202 at 1–2). The crux of the Government's argument is that Defendant was able to use the material during trial, and thus due process was not violated. *Id.* at 3–4. According to the Government, there was no prejudice because defense counsel used the impeachment evidence of the Supplemental and Oral Agreements to conduct her cross-examination of Matthew and to attack his credibility during closing arguments, and used video clips and photographs from Matthew's prior interviews as direct evidence to supplement questions he would not answer. *Id*. at 4–5. Further, the Court read to the

---

[2] The email states, in pertinent part: "Matthew entered a plea late this afternoon with a supp[lemental] agreement to cooperate and testify against your client. If he has to testify, the [Government] will recommend a 4 level reduction, and a 2 level reduction if he is not required to testify." (Dkt. No. 202, Ex. 1).

8

jury the stipulation agreed to by the parties regarding the Government's failure to disclose the Agreements. *Id.* at 5. Finally, based on its assertion that there was no prejudice to Defendant due to the Government's failure to disclose the existence and substance of the Supplemental and Oral Agreements before trial, the Government argues that there is no basis for the Court to exercise its inherent power to dismiss the Indictment. *Id.* at 10–11.

In his Reply, Defendant reemphasizes that—contrary to the Government's assertion—the Government was not forthcoming with either defense counsel or the Court about the existence or extent of the Supplemental and Oral Agreements. (Dkt. No. 208 at 1–2). Defendant also contests the Government's assertion that its case did not rest on Matthew's testimony, and contends that he "was prejudiced by the government's ability to call a witness who was not fully available for cross-examination." *Id.* at 3, 4.

## II. APPLICABLE LEGAL PRINCIPLES

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Exculpatory evidence that is subject to *Brady* includes information that could be used to impeach a government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985). As the Third Circuit has noted:

> To prove a *Brady* violation, a defendant must show that the evidence at issue meets three critical elements. First, the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching. Second, it must have been suppressed by the State, either willfully or inadvertently. Third, the evidence must have been material such that prejudice resulted from its suppression.

*Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (citations and quotations omitted).

9

The burden of establishing a *Brady* violation falls on the defendant. *Maynard v. Gov't of the V.I.*, 392 F. App'x 105, 119 (3d Cir. 2010) (citing *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005)). In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court explained that the "touchstone of materiality is a 'reasonable probability' of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial." *Id.* at 434. Further, materiality for *Brady* purposes "is not a sufficiency of evidence test." *Id.* "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id.* at 435. Instead, to establish a *Brady* violation one must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Courts must consider whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

There can be no violation of *Brady* without a finding of prejudice. *United States v. Bansal*, 663 F.3d 634, 670 (3d Cir. 2011) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). "Where the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened." *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir.1987) (citations omitted). Accordingly, a defendant "cannot argue that evidence was suppressed or that it was material to the issue of guilt [if] he ultimately used those materials at trial." *United States v. Claxton*, 766 F.3d 280, 304 (3d Cir. 2014); *see also United States v. Kubini*, 19 F. Supp. 3d 579, 627 (W.D. Pa. 2014) ("The law is firmly established that 'no denial of due process occurs if *Brady* material is disclosed to a criminal defendant in time for its effective use at trial.'" (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir.1983), *cert. denied*, 464 U.S. 1048 (1984))).

Further, dismissal of an indictment may be appropriate only in exceptional circumstances, "in response to particularly egregious due process violations." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005). (citations omitted). This rare sanction is "potentially available in cases of deliberate misconduct by the government which resulted in substantial prejudice to the defendant." *United States v. Jafari*, 2012 WL 5335242, at *2 (D.N.J. Oct. 26, 2012), *aff'd*, 648 F. App'x 226 (3d Cir. 2016) (emphasis omitted) (citing *Fahie*, 419 F.3d at 254–55). An indictment should be dismissed only in "narrow circumstances and upon a finding of willful prosecutorial misconduct which violates the Due Process clause and causes prejudice to the defendant." *Kubini*, 19 F. Supp. 3d at 626 (citations omitted). "Willful prosecutorial misconduct may be demonstrated through 'a constitutional violation that results from a reckless disregard for a defendant's constitutional rights,' or a pattern of constitutional violations showing recklessness on behalf of the prosecution. *Id.* (citing *Fahie*, 419 F.3d at 255–56).

The Court also has the inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposal of cases." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (quotation omitted). The phrases "inherent power," "inherent authority," and the like are used to describe "the basis for a court action seeking to maintain the integrity of the proceedings that is not directly tethered to a specific rule, statute, or constitutional provision." *United States v. Wright*, 913 F.3d 364, 370 n.6 (3d Cir. 2019) (collecting cases).

"[A] court may dismiss an indictment based upon its inherent authority only if [1] the Government engaged in misconduct, [2] the defendant was prejudiced, and [3] no less severe remedy was available to address the prejudice." *United States v. Wright*, 913 F.3d 364, 371–72 (3d Cir. 2019) (collecting cases). The Court's inherent power is limited by two principles: "(1) it 'must be a reasonable response to the problems and needs confronting the court's fair administration of

justice,' and (2) it 'cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute.'" *Wright*, 913 F.3d at 371 (quoting *Dietz*, 136 S. Ct. at 1892).

## III.  DISCUSSION

### A.  *Brady* Analysis

The Court begins its analysis by noting the Government's acknowledgement that "the material at issue in this case falls within the category of *Giglio* material and was not disclosed either prior to trial or before its existence came to light during the witness's testimony." (Dkt. No. 202 at 3). The question, therefore, is whether the delayed disclosure of the material at issue under the circumstances here resulted in a *Brady* violation.

As noted above, "[w]here the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able effectively to use it, due process is not violated and *Brady* is not contravened." *Johnson,* 816 F.2d at 924 (citations omitted). The Court finds that such is the case here, and thus Defendant's *Brady* argument fails.

In *United States v. Johnson*, prosecutors failed to provide the defendant with two fingerprint reports prior to trial. 816 F.2d at 924. However, defendant "had access to the [evidence at issue] before cross-examination took place and referred to the reports when cross-examination took place." *Id.* The defendant introduced the *Brady* material as evidence and argued to the jury that the reports showed the defendant was not guilty. *Id.* The district court in *Johnson* also took measures to minimize the possibility of unfairness to the defendant by precluding the government from introducing evidence challenging the reports. *Id.* The Third Circuit found that the defendant made effective use of the evidence during trial; thus, the defendant was not prejudiced and no *Brady* violation occurred. *Id.*

The Third Circuit's ruling in *Johnson* is instructive. Here, Defendant argues that the disclosure of the Supplemental Agreement and Oral Agreement after Matthew's direct examination "deprived the defense of sufficient time to effectively incorporate those agreements into cross-examination of Mr. Matthew" and "limited [Defendant's] ability to test the truthfulness of Mr. Matthew's testimony on direct examination." (Dkt. No. 190 at 5–6).[3] To the contrary, however, the record reveals that defense counsel not only effectively used the evidence of the Supplemental Agreement and Oral Agreement during her cross-examination, but obtained one stipulation that emphasized the "unusual" nature of the Government's actions and the inconsistency of the Government's actions with the "regular course of business," and another stipulation that Matthew's second recorded interview would be admitted into evidence for proof of the truth of his statements.

Defendant's protestations regarding the alleged limitations on his counsel's cross-examination as a result of the delayed production of the Supplemental Agreement and Oral Agreement are belied by the record. For example, Defendant contends that, because the evidence was suppressed, "defense counsel failed to cross-examine Mr. Matthew on the fact that 1) if the government did not consider his testimony at trial to be truthful, and thus 2) the plea agreement was voided, then 3) there would be no agreement by the government to argue to the Court that Mr. Matthew qualified for safety valve, and 4) Mr. Matthew would have no mechanism to avoid the

---

[3] Upon Matthew's refusal to respond to defense counsel's question on cross-examination, the Court held an extensive sidebar discussion with counsel. Trial Tr. vol. 3, 57–115. The jury was dismissed for the remainder of the afternoon, *id.* at 115–16, and defense counsel proceeded with her cross-examination the next morning after both counsel had agreed on the course of action that would be followed, including the essence of the stipulations. Trial Tr. vol. 4, 3–5. Defense counsel proceeded the morning after the issue arose without requesting any additional time from the Court to incorporate the new evidence into her cross-examination. *Id.* at 10.

13

ten-year mandatory sentence, even if he pled to the indictment." *Id.* at 6 n.1. However, the record paints a different picture:

> [Defense counsel:] And you understand that if you were to sit there and testify in a manner that the government did not believe to be truthful, that they would not be asking the judge for these reduction[s], correct?
> [Matthew:] That is correct.
> Q If your testimony is not deemed truthful by the government, you don't get the benefit of that supplemental agreement, correct?
> A That's correct.
> Q Which would bring you back to the 46 to 57 [months of a prison sentence], right?
> A Yes, it would.
> Q But that's not it, because if the government doesn't believe your testimony to be truthful, then the government can void your entire plea agreement, right?
> A I'm not sure.
> Q I'm talking about the agreement you have with the government is that they are the sole determinant of whether your testimony is truthful or not, right?
> A Right.
> Q It doesn't matter if your lawyer thinks your testimony is truthful, right?
> A Right.
> Q It is the government who decides whether you are able to argue before the Judge for two to two-and-a-half years or whether you have to deal with the ten-year mandatory sentence again, right?
> A That is correct.
> Q And are you here today testifying, hoping that the government will consider your testimony to be truthful, correct?
> A That is correct.
> Q [… ] Oh, just one clarification, when I say the government, you understand that I am referring to Mr. Huston sitting here, right?
> A Yes, I do.
> Q He decides whether you are truthful, right?
> A Correct.

Trial Tr. vol. 4, 38–40. In addition, in certain instances during the cross-examination when Matthew refused to answer a question per his Oral Agreement, defense counsel played a video clip from Matthew's second recorded interview with law enforcement that addressed the issue. *See, e.g., id.* at 47. By stipulation, the second recorded interview was admitted into evidence for the

truth of the matter asserted and, as in *Johnson*, the Government could not challenge the statements.[4]

Further, the jury was informed of the extent of the Government's failure to properly and timely inform Defendant of the existence and substance of the Supplemental and Oral Agreements. The parties negotiated the specific instructions that would be read to the jury for the purpose of addressing the Government's omissions. Ultimately, the parties stipulated that both the Supplemental and Oral Agreements were not timely provided to defense counsel and that the terms of the Agreements were "unusual." Trial Tr. vol. 6, 7–10. The stipulation outlined the multiple failures of the Government to comply with their obligations to Defendant. The parties stipulated that "[t]he government had an obligation to disclose the supplement to the plea agreement to the defense" and that "[t]he government did not inform the defense of the supplement prior to the start of trial." *Id.* at 8. The stipulation further states that "[t]he government did not notify the defense of this supplement until defense counsel initiated a discussion with the Court and the government about the scope of the cross-examination." *Id.* Additionally, the jury was informed that the Oral Agreement was "improper." *Id.* at 8–9. The parties also stipulated that the Government had "tunnel vision in prosecuting Mr. Henry" and that "[t]he entire ma[nn]er in which the government has handled the testimony of Mr. Matthew is inconsistent with the regular course of business." *Id.* at 10. In addition, because of the "improper oral agreement," the jury was instructed that it was able to use Matthew's statements from his second recorded interview, Defense Exhibit 12, "as proof of

---

[4] When presented with the possibility, posed by the Court, of Matthew's continued refusal to testify even in the face of a contempt finding, defense counsel articulated that her proposed remedy would be to impeach Matthew with the video of his interview and submit the video to the jury with an instruction that the video was submitted "for the truth since [Matthew] was refusing to answer." Trial Tr. vol. 3, 148–49. This course of action was exactly what was stipulated to by counsel and employed, albeit without a contempt citation.

15

the truth of what Mr. Matthew said in those statements." *Id*. at 9, 45. Thus the stipulation clearly informed the jury that the Government failed in its obligations to Defendant.

Defendant's speculative assertions as grounds for dismissal of the Indictment fare no better. Defendant posits that if he had received the Supplemental Agreement and Oral Agreement prior to trial, "the government likely would not have been permitted to call Mr. Matthew as a witness," and without Matthew's testimony, "there would be no witness to impeach Henry's final statement that he neither knew the night before, nor while in the bathroom the day of, that the cocaine was going to be placed in his luggage." (Dkt. No. 190 at 6). This argument, of course, builds speculation upon speculation. Moreover, the speculation embodied in Defendant's assertions is belied, in part, by the record.

The Government introduced video evidence of Defendant's post-arrest interview in which, by his own statements, Defendant admits that he knew that he would go into the bathroom at the airport and someone would put cocaine in his bag, and further admits that he knew this the night before the incident occurred. (Gov't Ex. 5 at 25:41–33:20). Thus, while Defendant made conflicting statements in his interview regarding his knowledge of these critical facts, Defendant's own admissions as well as the conflicting nature of his statements cannot be ignored—as Defendant attempts to do—in considering evidence that impeaches Defendant's credibility. In any event, Defendant ultimately opted to address the issue of Matthew's testimony not by seeking to exclude it, but by reaching agreement with the Government on the stipulations previously described.[5] Having chosen to avail himself of a very favorable stipulation regarding the

---

[5] With regard to the parties attempting to reach agreement on the course of action to follow in view of Matthew's refusal to testify fully, the Court stated: "I am not forcing you to agree, just so it's clear. I'm just saying if you agree on particular matters, then, the Court would be interested in hearing from you on that." Trial Tr. vol. 3, 175.

Government's missteps, together with the opportunity to attack Matthew's credibility in front of the jury, Defendant cannot now be heard to speculate as to what might have happened in the absence of Matthew's testimony and to claim prejudice as a result.

Defendant further surmises that, in the absence of the Oral Agreement, Matthew "would have testified to the names and identities of his co-conspirators" (Dkt. No.190 at 6), and defense counsel would have called them as witnesses to testify that "they did not know Mr. Henry and thus argue [Defendant] was not in the conspiracy," *id.* at 7. Whether Matthew could testify to the names of his alleged co-conspirators is unclear.[6] In any event, defense counsel had access to Matthew's second recorded interview in which he identified alleged co-conspirators from photographs provided by law enforcement and the law enforcement officers identified the individuals by name. *See, e.g.,* Def. Ex. 12 at 23:55–31:25. Notwithstanding the identification of two alleged co-conspirators in this manner, Defendant did not call *either* of those individuals as witnesses. *See* Trial Tr. vol. 3, 123 (AUSA Huston, referencing Defense Exhibit 12: "In one of the two interviews that were recorded, [Matthew] was shown a set of photographs, and he identified perhaps two or three individuals."). Thus, Defendant's assertion that he would have called alleged co-conspirators as witnesses if Matthew had identified them on cross-examination rings particularly hollow.

In sum, the Court does not find the evidence regarding Matthew's Supplemental and Oral Agreements to be material such that prejudice to Defendant resulted. While it is the Court's expectation that the Government would timely disclose *Brady* information—which was not done here—defense counsel obtained the Agreements in time to effectively use the evidence at trial during cross-examination and closing argument. *See* Trial Tr. vol. 4, 38–40; Trial Tr. vol. 6, 68–

---

[6] Matthew's second recorded interview, Defense Exhibit 12, reveals that he identified alleged co-conspirators from photographs shown by law enforcement officers, and the law enforcement officers supplied the names of the individuals.

70, 74–78, 83–94. In the final analysis, the jurors knew that Matthew had reached a plea agreement with the Government. They knew the contents of the plea agreement, as well as the contents of the Supplemental and Oral Agreements. They knew that the Supplemental Agreement allowed the Government to rescind the plea agreement should Matthew fail to testify truthfully at trial and that it was the Government, through AUSA Huston, who would decide whether the testimony was truthful. They knew that if the Government found Matthew's testimony to be truthful, at Matthew's sentencing hearing the Government would recommend to the Court a four-level reduction from the applicable sentencing range. They knew that the Government had an obligation to disclose the Supplemental Agreement, but that the defense did not learn of the substance of the supplement until after Matthew testified on direct examination. They knew that the Oral Agreement—which the Court and the defense learned about only during the course of Matthew's cross-examination—allowed Matthew to testify only to Defendant's role in the conspiracy and did not require him to identify anyone else. They knew that the terms of the Oral Agreement were "unusual and "improper." They knew that the manner in which the Government handled Matthew's testimony was "inconsistent with the regular course of business." They knew that the Government exhibited "tunnel vision" in prosecuting Henry. The jurors also knew that they could accept Matthew's statements from his second recorded interview—in which he admitted, *inter alia*, to having lied—for the truth of the statements in their consideration of the evidence.

Accordingly, the Court concludes that, while the Government did not produce the Supplemental and Oral Agreements prior to trial, Defendant was not prejudiced by the Government's failure to timely disclose this *Brady* material. Because Defendant was not prejudiced, there was no *Brady* violation, and therefore Defendant's motion to dismiss the Indictment on this ground will be denied.

### B. The Court's Inherent Power to Dismiss the Indictment

The Court now turns to Defendant's argument that, because of the alleged prosecutorial misconduct the Court should dismiss the Indictment under its inherent power to preserve the integrity of judicial proceedings. According to Defendant, the Government engaged in multiple misrepresentations to the Court regarding the plea agreement, Supplemental Agreement, and Oral Agreement. (Dkt. No. 190 at 8–16). Defendant argues that the prosecutor "both argued to the Court based on altered documents and made untrue representations to the Court." *Id.* at 18. As Defendant correctly notes, the Court expressed frustration with the Government's conduct on multiple occasions. *Id.* at 19. Defendant also rightly asserts that "[a] significant portion of the trial was spent dealing with" the effects of the Government's untimely disclosure of *Brady* material. *Id.* The Government counters that there is no basis for the Court to exercise its inherent power because the alleged prosecutorial misconduct did not result in prejudice to Defendant. (Dkt. No. 202 at 9–12).

As Defendant acknowledges in his reply, Third Circuit law requires Defendant to prove, *inter alia*, that the defendant suffered prejudice in order to dismiss an indictment under the Court's inherent authority. *See* Dkt. No. 208 at 5 (citing *Wright*, 913 F.3d at 375). Because the Court concludes, as discussed above, that there was no prejudice to Defendant, dismissal of the Indictment under the Court's inherent power would be inappropriate.[7] Accordingly, Defendant's request for dismissal under the Court's inherent authority will be denied.

---

[7] In addition, a less severe remedy than dismissal—specifically, the measures agreed to by both counsel and discussed herein—was available and employed to address any prejudice that Defendant otherwise would have suffered.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that the Government did not commit a *Brady* violation by the untimely disclosure of impeachment evidence because there was no prejudice to Defendant. The Court further finds that because Defendant was not prejudiced by the alleged prosecutorial misconduct, dismissal of the Indictment under its inherent power would be inappropriate. Accordingly, the Court will deny Defendant's Motion to Dismiss Indictment for Prosecutorial Misconduct.[8]

An appropriate Order accompanies this Memorandum Opinion.

Date:   December 10, 2019

/s/
WILMA A. LEWIS
Chief Judge

---

[8] While the Court will deny Defendant's Motion to Dismiss the Indictment, that should in no way suggest that the Court condones the actions of the Government. It does not. The requisite preparation, attention to detail, and oversight of the case on the part of the prosecution were clearly lacking. This was evident from counsel's: (1) untimely disclosure of *Brady* material; (2) unusual and untimely disclosed side agreement limiting the testimony of a witness, *see* Trial Tr. vol. 3, 119–28, 132–38, 173; (3) failure to affix the date of an amendment—rather than the original date—to an agreement, thus causing incorrect representations to the Court as to the timing of the agreement and its relationship to another agreement, *see* Trial Tr. vol. 3, 10–19; (4) lack of familiarity with the terms of the agreements, thus causing incorrect representations and omissions to the Court, *see* Trial Tr. vol. 3, 97–100, 119–28, 132–38; (5) failure to initially produce "all" materials in response to a clear directive from the Court, *see* Trial Tr. vol. 3, 18–19, 33–35; and (6) omission of pertinent information in response to inquiries from the Court, *see* Trial Tr. vol. 3, 110–14. These failures by the Government were unacceptable; fell far below the performance standards that the Court expects of counsel; and caused delay and frustration that were decidedly avoidable.